GUSSART, Respondent, vs. GREENLEAF STONE COMPANY, Appellant.

*January 10—January 28, 1908.*

*Master and servant: Injury to servant: Contributory negligence: Questions for jury: Duty of master as to warning servant: Delegation of duty to warn to foreman: Fellow-servants: Appeal and error: Harmless errors: Trial: Instructions to jury.*

1. In an action by a servant for personal injuries, under the evidence, stated in the opinion, it is *held* that it was for the jury to say whether the danger to which the servant was exposed and which occasioned the injury was not open and apparent to a man of ordinary intelligence who had no warning and no experience in the kind of work in which he was engaged.

2. The duty to instruct or warn a servant in cases where such warning or instruction is required is a duty of the master, and for omission of such duty he cannot shield himself merely because

he may have delegated that duty to a fellow-servant of the injured employee.

3. While, in summing up the evidence relative to each separate question of a special verdict, the use by the court of the expression "the plaintiff claims" or "the defendant claims" is not approved, its use cannot ordinarily be considered prejudicial error.

4. Where, in an action for personal injuries, in the charge to the jury the court gave correctly the rule as to the duty of plaintiff, after the injury, to reduce the injury by proper care and attention to and medical treatment of the injured member, and thereafter, in response to interruptions of counsel on both sides by oral suggestions, gave partial and incomplete statements of the rule, such conduct does not constitute prejudicial error.

APPEAL from a judgment of the circuit court for Brown county: S. D. HASTINGS, Circuit Judge. *Affirmed.*

The appeal is from a judgment rendered in an action for negligent injury to an employee.

*Charles A. Vilas,* for the appellant.

For the respondent there was a brief by *Wigman, Martin & Martin,* and oral argument by *P. H. Martin.*

Among other references cited upon the part of the appellant were the following: *Roth v. S. E. Barrett Mfg. Co.* 96 Wis. 615, 71 N. W. 1034; *Holt v. C., M. & St. P. R. Co.* 94 Wis. 596, 69 N. W. 352; *Schultz v. C., M. & St. P. R. Co.* 116 Wis. 31, 92 N. W. 377; *McMillan v. Spider Lake S. M. & L. Co.* 115 Wis. 332, 91 N. W. 979; *Relyea v. Tomahawk P. & P. Co.* 110 Wis. 307, 85 N. W. 960; *Hencke v. Ellis,* 110 Wis. 532, 86 N. W. 171; *Showalter v. Fairbanks, M. & Co.* 88 Wis. 376, 60 N. W. 257; *Larsson v. McClure,* 95 Wis. 533, 70 N. W. 662; *Nash v. C., M. & St. P. R. Co.* 95 Wis. 327, 70 N. W. 293; *Sladky v. Marinette L. Co.* 107 Wis. 250, 83 N. W. 514; *Bigelow v. Danielson,* 102 Wis. 470, 78 N. W. 599; *Corrigan v. West Div. S. Co.* 133 Wis. 77, 113 N. W. 441; *Peschel v. C., M. & St. P. R. Co.* 62 Wis. 338, 21 N. W. 269; *Dwyer v. Am. Exp. Co.* 82 Wis. 307, 52 N. W. 304; *Portance v. Lehigh Val. C. Co.* 101

Wis. 574, 77 N. W. 875; *Dahlke v. Ill. S. Co.* 100 Wis. 431,
76 N. W. 362; *Gereg v. Milwaukee Gas L. Co.* 128 Wis.
35, 107 N. W. 289; *Hamann v. Milwaukee B. Co.* 127 Wis.
550, 106 N. W. 1081; *Van de Bogart v. Marinette & M. P.
Co.* 127 Wis. 104, 106 N. W. 805; *Banderob v. Wis. Cent. R.
Co.* 133 Wis. 249, 113 N. W. 738.

Among other references cited upon the part of the re-
spondent were the following: *Horn v. La Crosse B. Co.* 123
Wis. 399, 101 N. W. 935; *Baumann v. C. Reiss C. Co.* 118
Wis. 330, 95 N. W. 139; *Klochinski v. Shores L. Co.* 93
Wis. 417, 67 N. W. 934; *Schamper v. Ullrich,* 131 Wis.
524, 111 N. W. 691; *Gill v. Homrighausen,* 79 Wis. 634,
48 N. W. 862; *Thompson v. Edward P. Allis Co.* 89 Wis.
523, 62 N. W. 527; *Chopin v. Badger P. Co.* 83 Wis. 192,
53 N. W. 452; *Revolinski v. Adams C. Co.* 118 Wis. 324, 95
N. W. 122.

Timlin, J.   The verdict and judgment for plaintiff rest
upon the failure of defendant to warn or instruct the plaint-
iff relative to the dangers attendant upon the work of stopping
cars under the following circumstances: The defendant is
operating a stone quarry and manufacturing and shipping
lime and crushed stone at Greenleaf, Brown county, Wis-
consin.   The crushed stone is loaded on railroad cars by
spouting the same from pockets above the car.   This makes
it necessary to stop the car under the pocket.   The spur
track leading under these pockets begins at the switch and
terminates at a ledge of rock high enough to prevent further
progress of track or cars thereon.   From this ledge back to
the switch there is considerable descent, so that cars are
hauled up to the ledge on the spur track by a team of horses,
and upon detaching the horses the car immediately starts
back down the spur track, passing under the pockets toward
the switch.   It is necessary to enable the horses to draw the
car up that the brakes be loose.   It is necessary, in order

to control the car going back by its own momentum, that
the brakes be tightened, and a man is on top of the car
for that purpose at the time the team is detached.    But
lest the car so gain in momentum while this man is tak-
ing up the slack of the brake chain that he would be unable
to control it, in order to stop it under the pocket another man
with an iron bar called a crowbar or pinch bar is to hold the
car in the manner hereinafter described until the brakeman
acquires sufficient control of it by means of his brake.    A
crowbar or a pinch bar is an iron bar four or four and one-
half feet long, round except for a foot or more at the lower
end, which is square, and about an inch or an inch and a half
in diameter.    The lower square end of the bar is cut off
diagonally so as to form a pointed wedge with one of the
square surfaces and an obtuse angle with the opposite square
surface.    The last point of contact between the diagonal
cut-off and the square surface is called the heel, and the
former point of contact is called the point, and by inserting
the point between the car wheel and the rail on which the
wheel runs, close to the flange, and using the heel as a ful-
crum and bearing down upon the bar, considerable power
can be exerted toward stopping the car, depending, of course,
upon the relative distance from the heel to the point and also
from the heel to the handle end or place where the power is
applied.    The distance from the point to the heel along the
square surface of the bar would not exceed two inches, and
it must be apparent that if the wheel is not immediately
stopped, but follows on the bar to a place more than two inches
from the point, the conditions under which power is attempted
to be applied are suddenly reversed, and the bar will be
swiftly thrown downward with all the weight of the car which
that particular wheel, elevated by the thickness of the bar,
carries. The top surface of the rail is not level, but slightly
rounded, nor is the periphery of the car wheel flat, but is
larger next the flange at the inside of the rail and smaller at

the outside. To use the pinch bar effectively in order to stop the car it is necessary to insert the point of the bar properly on the surface of the rail near the flange on the car wheel with the heel downward, and, using the heel as a fulcrum, press down on the bar, or else merely block the wheel by inserting the point of the bar in the manner described without pressing down. The freight car in question was a gondola of about 50,000 pounds capacity. The utmost blocking effect of the bar would be that of a wedge-shaped piece of iron two inches long and one and one-half inches thick at the thickest part of the wedge. The effectiveness as a block could of course be increased by skilful handling of the bar as a lever.

The testimony of the plaintiff is contradicted on very material points by every witness present at the time of the injury and is quite uncertain and confused with reference to the manner of his injury. We are brought to face with the defendant's motion to strike out the answer to the third question as contrary to the uncontradicted evidence, and to answer that question in the affirmative and grant judgment to the defendant upon the verdict so amended. The second question inquired whether stopping the car at the place in question when in motion and by means of a pinch bar was an act dangerous to the party doing it, and this the jury very properly answered in the affirmative. The third question and answer were as follows: "If your answer to the second question should be 'Yes,' then answer this: Was such danger one that was open and apparent to a man of ordinary intelligence without warning or experience? A. No."

The evidence relating to the manner of injury, in its aspect most favorable to the plaintiff, showed that the plaintiff was a man thirty-seven years old employed by the defendant as a common laborer, and had no experience in stopping cars, and that on or about August 26, 1905, Thomas Wakeley, the foreman in charge for the defendant, early in the afternoon had the plaintiff called down from where he was working in

the quarry breaking stone and told plaintiff to quit work there and to come and stop cars. The plaintiff testified:

"When he told me to stop the car it was west about two and one-half rods of the point where I got hurt. It was drawn up toward the east. Mr. Wakeley told me to stop the car with what they call a 'crowbar,' about four or a little better—four and one-half perhaps—feet long. There was a slant in the bottom on the underside, a kind of heel. The upper surface was straight, and was slanted off at the heel. . . . I picked up the bar, and when the car came up to me I tried to stop it with the bar. They pulled the car up with a team of horses to the east of me. Q. Did it pass you as they pulled it up with the team of horses? A. Yes; it did at that time, yes. When it passed me going east I was standing alongside the track within ten or fifteen feet of Wakeley at the point where I picked up the bar on the north side of the track. Emil Sebulski drove the team that pulled the car east. I waited until the car went up and it came back and I tried to stop it. The car went about two rods east, I should judge, and I remained standing with the bar in my hand. They unhooked the team, and the car started back as soon as the team was unhooked. The horses pulled the car up as far as they could walk. I don't know whether the end of the car bunted against anything. The car started back from itself. The grade is toward the west—toward the depot, and as the car came back west I tried to stop the car with the bar in under at the wheel on the rail—the west wheel; that is, the first wheel. I was still on the north side of the track. I went on the rail in under the wheel the best way I knew how. I wasn't told how. I stood on the north side of the track, and tried to stop the car by putting the bar under the wheel; not crossways, but put the foot under the wheel or point of the bar. It did not stop the first wheel, but the car went over the bar. It would not hold it. I held it but it went over the bar; that is, I couldn't stop the car. The wheel raised off the rail. After that, when the second wheel catched it, it catched me. It went through and the second wheel catched it, and I couldn't hold it. I tried to stop it again, and I couldn't hold it, and it catched me, and the bar snapped down and turned in my hand. As soon as the wheel touched it, it

turned in my hand, and I couldn't hold it and shut down.
. . . The car went over it and shut down and bent the bar;
the bar carrying the weight of the first wheel when it went
over it. When it snapped out of my hands it went down
kind of quick and catched me across my toes. My right foot
was alongside of the track on the ties on the crushed rock
and sand that was down there. My foot was about eight or
ten inches from the rail. I didn't measure it. The bar held
me there, and I couldn't pull loose, and was fastened down
pretty tight. . . . I was unable to loosen myself, and the
teamster came around and helped me out. The car stopped
there, and the second wheel held the bar. Frank Summers
helped the teamster get me out. I had never done that work
before, nor seen it done, and knew nothing about how to do it.
I did not know how to handle that bar so as to stop that car.
Wakeley didn't tell me anything about how I should do the
work. No one ever gave me any instruction. I didn't know
there was any danger in doing it. When I tried to stop it
the car was going about as fast as a common gait—walk.
From the ledge of the rock east of me to the point where I
was hurt was about two and one-half rods. I didn't measure
it. The car was not loaded. . . . When the car stopped and
the horses were unhitched and it started back, the nearest
end of the car was probably fifteen or sixteen feet from me.
I didn't walk toward the car, but stood still, and when it
reached me it was going about as fast as a common gait—
walk."

The writer and Mr. Justice MARSHALL are of opinion
that the order to stop the car, as testified to by plaintiff, could
not properly be interpreted as an order to stop the car while
in considerable motion and after it had attained on the down
grade a momentum such as shown, and that the danger of so
attempting to stop the car was so obvious and apparent that
the answer to the third question of the special verdict should
have been changed from "No" to "Yes." But the decision
of this court is otherwise, and it must therefore be held
upon the evidence above quoted and upon the facts above
stated that it was for the jury to say, as they did in their

answer to the third question, that such danger was not open and apparent to a man of ordinary intelligence who had no warning and no experience in this kind of work.

It is next argued that the failure to warn or instruct the plaintiff with reference to the danger of stopping cars was the negligence of the foreman, Thomas Wakeley, hence the negligence of a fellow-servant. But the duty to instruct or warn an employee in cases where such warning is required is a duty of the master, and for the omission of such duty he cannot shield himself merely because he may have delegated that duty to a fellow-servant of the injured employee. *Horn v. La Crosse B. Co.* 123 Wis. 399, 101 N. W. 935; *Klochinski v. Shores L. Co.* 93 Wis. 417, 67 N. W. 934.

It is further contended that the trial court erred in its charge to the jury because in summing up the evidence to the jury relative to each question separately he made use of the expression "the plaintiff claims" or "the defendant claims." This form of presentation is not approved, but its use cannot ordinarily be considered prejudicial error. *Banderob v. Wis. Cent. R. Co.* 133 Wis. 249, 113 N. W. 738.

It is argued that the trial court erred in its instructions to the jury relative to the duty of the plaintiff, after the injury, to reduce the injurious consequences flowing from such injury by proper care and attention to and medical treatment of the injured member. The trial court first gave the rule correctly, but, in response to an interruption by plaintiff's counsel at this point, made an oral statement which was an inadequate and incomplete presentation of this rule. The defendant's counsel then interrupted with another suggestion which the court then gave to the jury, but which was also tentative. We have then a case where the jury were given the rule correctly, and thereafter, in response to interruptions of counsel by oral suggestion, the court gave partial and imperfect statements of the rule of law. We do not consider this prejudicial or reversible error.

No other questions seem to require notice, and the judgment must be affirmed.

*By the Court.*—The judgment of the circuit court is affirmed.

BASHFORD, J., took no part.